*22-mj-2286-MBB*
*22-mj-2287-MBB*
*22-mj-2288-MBB*

## <u>AFFIDAVIT IN SUPPORT OF</u>
## <u>A CRIMINAL COMPLAINT AND AN APPLICATION FOR A SEARCH WARRANT</u>

I, John Hannigan, being duly sworn, state:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a police officer employed by the Nashua, New Hampshire Police Department (NPD) since 2010. In September 2019, I transferred to NPD's Narcotics Intelligence Division, where I conducted investigations into narcotics-related offenses. Since August 2021, I have served as a Task Force Officer (TFO) to the Drug Enforcement Administration (DEA) Strike Force, Manchester, New Hampshire District Office. I have attended narcotics and criminal investigation training classes put on by the New Hampshire Police Standards and Training Council, the DEA, the Counterdrug Training Center, as well as by the NPD.

2.      As a DEA TFO, I am authorized to investigate violations of the laws of the United States, including violations of the federal drug laws and money laundering laws in Title 21 and Title 18, respectively, of the United States Code. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

3.      Through my training, education, and experience, I have become generally familiar with the manner in which drug trafficking organizations ("DTOs") conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law

1

enforcement.  I have participated in the execution of numerous search warrants resulting in the seizure of large quantities of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances; United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in the debriefing of numerous defendants, informants and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations. I have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants, and executing arrests.

4.      I am currently investigating Rafael SIERRA-BAEZ, DOB: XX/XX/1980, for distribution and possession with intent to distribute a controlled substance, fentanyl, in violation of 21 U.S.C. § 841 (the "Target Offense").

## PURPOSE OF AFFIDAVIT

5.      I submit this affidavit in support of:

a.  A criminal complaint charging Rafael SIERRA-BAEZ with distribution of a controlled substance, fentanyl, in violation of 21 U.S.C. § 841;

b.  an application for a warrant to search the residence of Rafael SIERRA-BAEZ at 161 Berkeley Street, Apartment 13, Lawrence, Massachusetts,[1] (the "Subject

---

[1] Different public and commercial databases describe 161 Berkley Street as in either Methuen or Lawrence, Massachusetts.  For example, Google Earth has the address listed as located in Methuen, while various real estate websites have the address listed in Lawrence.  Based on my review of the City Assessor's records for Methuen and Lawrence, 161 Berkeley Street is only

Premises"), as described in Attachment A-1, because there is probable cause to believe that the Subject Premises contains evidence, fruits, and instrumentalities of the crimes listed above, as described in Attachment B; and

   c.   an application for a warrant to search a 2008 red Mazda CX-9, bearing MA Registration 164S50 and VIN #JM3TB38V280127425, which is registered to SIERRA-BAEZ, ("Subject Vehicle 1"), as described in Attachment A-2, because there is probable cause to believe that Subject Vehicle 1 contains evidence, fruits, and instrumentalities of the crimes listed above, as described in Attachment B.

6.     The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested search warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

### Background of Investigation

7.     In January 2022, law enforcement from NPD and the DEA arrested an individual (hereinafter, "CW-1") for drug related offenses. CW-1 agreed to cooperate with law enforcement in exchange for consideration in pending New Hampshire state charges related to that January 6 arrest, including possession of a controlled drug, sale of a controlled drug, falsifying physical evidence, resisting arrest, and simple assault on a police officer.  CW-1 has not received any monetary compensation or any other consideration in exchange for CW-1's cooperation in this

--------

listed in City Assessor's records for Lawrence, Massachusetts; therefore, this search warrant describes the address as in Lawrence.

case. CW-1 has an extensive criminal history, including convictions for possession of a controlled drug, distribution of class A and B drugs, felon in possession of a dangerous weapon, and driving after suspension.  Since CW-1 began cooperating, all information from CW-1 that could be corroborated by agents has proven true and correct. For example, agents confirmed historical information provided by CW-1 through open-source searches, social media searches, review of photographs, and review of police records.  Accordingly, I find the information provided by CW-1 to be reliable.

8.     CW-1 advised agents of an individual known to CW-1 as "Chello," later identified as Rafael SIERRA-BAEZ based on RMV records for the Subject Vehicle 1 used in the controlled buys described below, RMV photos of SIERRA-BAEZ, and physical surveillance.  CW-1 stated that CW-1 had been purchasing fentanyl from SIERRA-BAEZ for several years. CW-1 stated that CW-1 would contact SIERRA-BAEZ at the phone numbers 978-590-5034 and 857-269-9840 in order to set up a narcotics transaction. CW-1 stated CW-1 would typically select a location in Lawrence or Methuen, MA, and SIERRA-BAEZ would arrive shortly thereafter and sell CW-1 the fentanyl. CW-1 advised that SIERRA-BAEZ has multiple "runners" who sell drugs for him, but CW-1 has built a relationship with SIERRA-BAEZ and is able to purchase from him directly. CW-1 stated that CW-1 has seen SIERRA-BAEZ in possession of multiple kilograms of fentanyl.

9.     From February 2022 to the present, members of the DEA Manchester District Office Group 2 have completed five controlled purchases of fentanyl from SIERRA-BAEZ, as set forth below.  For each of the fentanyl sales, SIERRA-BAEZ left from the Subject Premises to meet CW-1 and complete the exchange.  During four of the five controlled buys, SIERRA-BAEZ drove

Subject Vehicle 1 to meet with the CW-1 and complete the drug sale. [2]

**Controlled Fentanyl Transactions**

*February 22, 2022 – Controlled Buy #1*

10.     On February 22, 2022, at approximately 12:05 p.m., at the direction of law enforcement, CW-1 contacted SIERRA-BAEZ at the phone number ending in 5034. During the conversation, which was in our presence and audio recorded, SIERRA-BAEZ agreed to sell CW-1 10 grams of fentanyl for $400. CW-1 requested to meet at Chef Co Restaurant at 152 Haverhill Street in Methuen, MA, in the Merrimac Plaza.

11.     At approximately 12:19 p.m., at my direction, CW-1 contacted SIERRA-BAEZ at the phone number ending in 5034 phone number. SIERRA-BAEZ advised he would be at the pre-determined meeting location in approximately 15 minutes.  Prior to the transaction, TFO O'Connor and I searched CW-1 for drugs, money, and contraband with negative results. CW-1 was given $400 in official advanced funds (OAF) and outfitted with an audio/video recording device that allowed agents to monitor events in real-time. TFO O'Connor and I drove CW-1 to the meet location, and agents monitored CW-1 throughout the transaction through physical surveillance and real-time video transmissions.

12.     At approximately 12:25 p.m., CW-1, TFO O'Connor and I arrived at the Chef Co Restaurant in Merrimac Plaza. CW-1 was again briefed on the transaction and left the vehicle to await the arrival of SIERRA-BAEZ.

13.     At approximately 12:38 p.m., TFO Lambert observed Subject Vehicle 1 pull into

---

[2] In the one other controlled buy, SIERRA-BAEZ drove a 2017 black Honda CRV, bearing Maryland Temporary Registration T5086951 and VIN# 5J6RW2H90HL013940, ("Subject Vehicle 2").

the Merrimac Plaza parking lot. Agents conducting surveillance were able to positively identify the operator of Subject Vehicle 1 as SIERRA-BAEZ, and no one else was observed in the vehicle.

14.     At approximately 12:40 p.m., I observed SIERRA-BAEZ meet with CW-1 near the Chef Co Restaurant. CW-1 reached into the driver's side window of Subject Vehicle 1 and completed a hand-to-hand exchange with SIERRA-BAEZ. SIERRA-BAEZ then exited the parking lot.

15.     At approximately 12:45 p.m., CW-1 returned to TFO O'Connor and me. CW-1 relinquished the suspected fentanyl and confirmed the person he met with was SIERRA-BAEZ. CW-1 stated that SIERRA-BAEZ pulled into the parking lot in Subject Vehicle 1 and CW-1 approached his driver's side window. CW-1 stated there was minimal conversation, and SIERRA-BAEZ provided CW-1 with fentanyl and in exchange CW-1 provided SIERRA-BAEZ with $400 in OAF. CW-1 was again searched for contraband with negative results. This transaction was captured on audio and video recording. Agents performed a field test on the suspected fentanyl supplied by SIERRA-BAEZ, which was presumptively positive for the presence of fentanyl. Agents sent the suspected fentanyl to the DEA Northeast Laboratory for analysis and testing.  The results are pending.

16.     After the controlled buy, law enforcement from the DEA and Massachusetts State Police (MSP) maintained physical surveillance on SIERRA-BAEZ while he was operating Subject Vehicle 1. During surveillance, SIERRA-BAEZ began to drive erratically, changing his speed and making last second turns. As a result, surveillance was temporarily lost on SIERRA-BAEZ. Based upon my training and experience, I know that narcotics traffickers are aware that law enforcement attempts to follow them and they utilize these tactics as "counter surveillance" in an attempt to

thwart law enforcement.

17.    At approximately 12:52 p.m., Sgt. Bruce located Subject Vehicle 1 parked between 153 and 161 Berkeley Street. Previous law enforcement surveillance observed the Subject Vehicle 1 consistently parked at this location. The vehicle remained at the Subject Premises overnight.

### *March 10, 2022 – Controlled Buy #2*

18.    On March 10, 2022, at approximately 11:30 a.m., at the direction of law enforcement, CW-1 contacted SIERRA-BAEZ at the phone number ending in 5034. During this conversation, which was in our presence and audio recorded, SIERRA-BAEZ agreed to sell CW-1 10 grams of fentanyl for $400. The meeting location was set for the Chef Co Restaurant at 152 Haverhill Street in Methuen, MA, in the Merrimac Plaza. Prior to the transaction, CW-1 was searched for drugs, money, and contraband with negative results. CW-1 was given $400.00 in official advanced funds (OAF) and outfitted with an audio/video recording device that allowed agents to monitor events in real-time.  TFO O'Connor and I drove CW-1 to the meet location, and agents monitored CW-1 throughout the transaction through physical surveillance and real-time video transmissions.

19.    At approximately 11:30 a.m., members of the DEA and MSP established surveillance at the Subject Premises. Subject Vehicle 1 was located at this address.

20.    At approximately 11:51 a.m., SA MacDonald observed SIERRA-BAEZ exit the front door of the Subject Premises and enter Subject Vehicle 1. Surveillance was attempted on the vehicle; however, it was lost in the area of Park Street nearby.

21.    At approximately 12:00 p.m., CW-1, TFO O'Connor, and I travelled to Chef Co Restaurant. Law enforcement officers had already established surveillance in the area for the

anticipated transaction. Upon arrival, CW-1 again contacted SIERRA-BAEZ at the phone number ending in 5034. During the conversation, SIERRA-BAEZ advised CW-1 he would arrive in approximately 15 minutes.

22.     At approximately 12:05 p.m., SA MacDonald observed Subject Vehicle 1 return to the Subject Premises. SIERRA-BAEZ exited the vehicle along with a female toddler and the two walked into the building.

23.     At approximately 12:09 p.m., CW-1 exited my vehicle and waited in front of the Chef Co Restaurant for the anticipated transaction.  Law enforcement monitored CW-1 at all times through physical surveillance and real-time video transmissions.

24.     At approximately 12:12 p.m., SA MacDonald observed SIERRA-BAEZ exit the Subject Premises and enter Subject Vehicle 1. Agents maintained surveillance on the vehicle and followed directly to the Chef Co Restaurant, the agreed-upon meeting location between CW-1 and SIERRA-BAEZ.

25.     At approximately 12:20 p.m., I observed Subject Vehicle 1 enter the lot. Agents conducting surveillance were able to positively identify the operator of the vehicle as SIERRA-BAEZ, and no one else was observed in the vehicle. The vehicle circled around the lot, and agents observed SIERRA-BAEZ continuously look to his left, right, and behind him. SIERRA-BAEZ was driving at a slow speed, and it appeared as though he was looking to see if anyone was watching him. Based upon my training and experience, I believe SIERRA-BAEZ was looking for members of law enforcement prior to conducting the narcotics sale with CW-1.

26.     At approximately 12:22 p.m., I observed Subject Vehicle 1 pull in front of the Chef Co Restaurant and CW-1 approach the driver's side of the vehicle. SIERRA-BAEZ and CW-1

completed a hand-to-hand transaction through the driver's side window and SIERRA-BAEZ then drove away from the lot. Law enforcement later observed Subject Vehicle 1 at the Subject Premises, where it remained overnight.

27.     Several minutes later, CW-1 returned to TFO O'Connor and me, and relinquished the 10 grams of suspected fentanyl. CW-1 confirmed CW-1 met with SIERRA-BAEZ, who was operating Subject Vehicle 1. CW-1 stated SIERRA-BAEZ provided CW-1 with the suspected fentanyl and in exchange CW-1 provided SIERRA-BAEZ with $400 in OAF. CW-1 was again searched for contraband with negative results. This transaction was captured on audio and video recording. Agents performed a field test on the suspected fentanyl supplied by SIERRA-BAEZ, which was presumptively positive for the presence of fentanyl.  Agents sent the suspected fentanyl to the DEA Northeast Laboratory for analysis and testing.  The results are pending.

### *March 16, 2022 – Controlled Buy #3*

28.     On March 16, 2022, at approximately 3:00 p.m., at the direction of law enforcement, CW-1 contacted SIERRA-BAEZ at the phone number ending in 5034. During this conversation, which was in our presence and audio recorded, SIERRA-BAEZ agreed to sell CW-1 20 grams of fentanyl for $800. CW-1 and SIERRA-BAEZ agreed to meet at Chef Co Restaurant at 152 Haverhill Street in Methuen, MA, in the Merrimac Plaza.  Prior to the transaction, CW-1 was searched for drugs, money, and contraband with negative results. CW-1 was given $800 in official advanced funds (OAF) and outfitted with an audio/video recording device that allowed agents to monitor events in real-time.  TFO O'Connor and I drove CW-1 to the meet location, and agents monitored CW-1 throughout the transaction through physical surveillance and real-time video transmissions.

29.     At approximately 2:55 p.m., members of the DEA and MSP established surveillance in the area of the Subject Premises.

30.     At approximately 3:09 p.m., SA Commander observed SIERRA-BAEZ arrive at the Subject Premises operating Subject Vehicle 1. SIERRA-BAEZ entered the Subject Premises where he remained for approximately 6 minutes. When SIERRA-BAEZ exited the building, he returned to Subject Vehicle 1 and began travelling to the Chef Co Restaurant; agents maintained surveillance on the vehicle.

31.     At approximately 3:25 p.m., SA MacDonald observed Subject Vehicle 1 pull into the Merrimac Plaza parking lot. Agents conducting surveillance were able to positively identify the operator of the vehicle as SIERRA-BAEZ, and no one else was observed in the vehicle. Prior to meeting with CW-1, Subject Vehicle 1 circled around the lot, and agents observed SIERRA-BAEZ continuously look to his left, right, and behind him. SIERRA-BAEZ was driving at a slow speed, and it appeared as though he was looking to see if anyone was watching him. Based upon my training and experience, I believe SIERRA-BAEZ was looking for members of law enforcement prior to conducting the narcotics sale with CW-1.

32.     At approximately 3:26 p.m., SIERRA-BAEZ met with CW-1 in front of the Chef Co Restaurant. TFO O'Connor and I observed CW-1 reach into the driver's side window of Subject Vehicle 1 and complete a hand-to-hand exchange with SIERRA-BAEZ. SIERRA-BAEZ then drove away from CW-1, first heading toward the plaza exit in the area he had entered from, but then he made an abrupt change in direction across the parking lot to a different exit. SA Commander and SA MacDonald attempted to follow SIERRA-BAEZ, but SIERRA-BAEZ turned into the opposite direction that he travelled from and drove toward the highway at a high rate of

speed. Surveillance was subsequently terminated. Again, based upon my training and experience I know this behavior is an attempt to elude law enforcement. Law enforcement later observed Subject Vehicle 1 at the Subject Premises, where it remained overnight.

33.     Several minutes later, CW-1 returned to TFO O'Connor and me, and relinquished the 20 grams of suspected fentanyl. CW-1 confirmed he met with SIERRA-BAEZ, who was operating Subject Vehicle 1. CW-1 stated SIERRA-BAEZ provided CW-1 with the suspected fentanyl and in exchange CW-1 provided him with $800 in OAF. CW-1 was again searched for contraband with negative results. This transaction was captured on audio and video recording. Agents sent the suspected fentanyl to the DEA Northeast Laboratory for analysis and testing.  The results are pending.

### *April 14, 2022- Controlled Buy #4*

34.     On April 14, 2022, at approximately 12:31 p.m., at the direction of law enforcement, CW-1 contacted SIERRA-BAEZ at the phone number ending in 5034. During this conversation, which was in our presence and audio recorded, SIERRA-BAEZ agreed to sell CW-1 40 grams of fentanyl for $1,600. CW-1 and SIERRA-BAEZ agreed to meet at Chef Co Restaurant at 152 Haverhill Street in Methuen, MA, in the Merrimac Plaza.  Prior to the transaction, CW-1 was searched for drugs, money, and contraband with negative results. CW-1 was given $1,600 in official advanced funds (OAF) and outfitted with an audio/video recording device that allowed agents to monitor events in real-time.  TFO O'Connor and I drove CW-1 to the meet location, and agents monitored CW-1 throughout the transaction through physical surveillance and real-time video transmissions.

35.     At approximately 12:52 p.m., SA Commander observed SIERRA-BAEZ as well as an unknown Hispanic male ("Person 1") exit the Subject Premises and enter into Subject Vehicle 2. SIERRA-BAEZ entered the driver's seat and Person 1 entered the front right passenger's seat. At approximately 12:53 p.m., SIERRA-BAEZ and Person 1 left the Subject Premises and were followed to Chef Co by members of the DEA and MSP. During surveillance, SA MacDonald was able to positively identify SIERRA-BAEZ as the driver of Subject Vehicle 2.

36.     At approximately 1:04 p.m., TFO O'Connor and I observed Subject Vehicle 2 enter the Merrimac Plaza.  After doing a loop around the parking lot, SIERRA-BAEZ met with CW-1 in front of the Chef Co Restaurant.  At approximately 1:06 p.m., agents observed the hand-to-hand transaction between CW-1 and SIERRA-BAEZ through the driver's side window of Subject Vehicle 2, and the individuals subsequently separated. SIERRA-BAEZ was seen returning to the Subject Premises in Subject Vehicle 2 at approximately 1:13 p.m., where the vehicle remained overnight.

37.     Several minutes later, CW-1 returned to TFO O'Connor and me, and relinquished the 40 grams of suspected fentanyl. CW-1 confirmed he met with SIERRA-BAEZ who was operating Subject Vehicle 2. CW-1 stated SIERRA-BAEZ provided CW-1 with the suspected fentanyl and in exchange CW-1 provided SIERRA-BAEZ with $1,600 in OAF. CW-1 stated there was an unknown male in the front passenger's seat, however CW-1 confirmed he dealt directly with SIERRA-BAEZ and not this male. CW-1 was again searched for contraband with negative results. This transaction was captured on audio and video recording. Agents performed a field test on the suspected fentanyl supplied by SIERRA-BAEZ, which was presumptively positive for the presence of fentanyl. The approximate weight of the suspected fentanyl was 42.21 grams.  Agents

sent the suspected fentanyl to the DEA Northeast Laboratory for analysis and testing.  The results are pending.

### *May 4, 2022 - Controlled Buy # 5*

38.     On May 4, 2022, at approximately 10:45 a.m., at the direction of law enforcement, CW-1 contacted SIERRA-BAEZ at the phone number ending in 1358.  CW-1 provided this number to me several days prior, and stated that it was the new number used by SIERRA-BAEZ. During this conversation, which was in our presence and audio recorded, SIERRA-BAEZ agreed to sell CW-1 40 grams of fentanyl for $1,600. CW-1 and SIERRA-BAEZ agreed to meet at Chef Co Restaurant at 152 Haverhill Street in Methuen, MA, in the Merrimac Plaza.  Prior to the transaction, CW-1 was searched for drugs, money, and contraband with negative results. CW-1 was given $1,600 in official advanced funds (OAF) and outfitted with an audio/video recording device that allowed agents to monitor events in real-time.  TFO Judd and I drove CW-1 to the meet location, and agents monitored CW-1 throughout the transaction through physical surveillance and real-time video transmissions.

39.     At approximately 11:10 a.m., SA MacDonald observed SIERRA-BAEZ as well as an unknown Hispanic female ("Person 2") exit the Subject Premises and enter Subject Vehicle 1. SIERRA-BAEZ entered the driver's seat, and Person 2 entered the front right passenger's seat. Shortly thereafter, SIERRA-BAEZ and Person 2 left the Subject Premises and were followed to Chef Co by members of the DEA.  During surveillance, SA MacDonald was able to positively identify SIERRA-BAEZ as the driver of Subject Vehicle 1.

40.     At approximately 11:18 a.m., TFO Judd and I observed Subject Vehicle 1 enter the Merrimac Plaza.  The vehicle drove to the front of the "Rainbow" store and parked in the fire lane.

CW-1 walked to the vehicle, and CW-1 and SIERRA-BAEZ entered the store.  Agents monitored the video surveillance while CW-1 and SIERRA-BAEZ were in the store and, after briefly walking around the store, the two exited and returned to Subject Vehicle 1.  CW-1 was seen reaching into the front passenger's seat, then the rear passenger's seat, and shortly thereafter, SIERRA-BAEZ reached into the rear passenger's seat. CW-1 and SIERRA-BAEZ then separated, and SIERRA-BAEZ and Person 2 left the parking lot in Subject Vehicle 1 at approximately 11:26 a.m.

41.     Several minutes later, CW-1 returned to TFO Judd and me, and relinquished the 40 grams of suspected fentanyl. CW-1 stated CW-1 walked to Subject Vehicle 1 and SIERRA-BAEZ directed CW-1 to go inside the "Rainbow" store. CW-1 stated that SIERRA-BAEZ attempted to have CW-1 complete the transaction inside the store with Person 2; however, CW-1 requested to do the deal with SIERRA-BAEZ.  CW-1 stated that, after some conversation, SIERRA-BAEZ left the suspected fentanyl on the front passenger's seat of Subject Vehicle 1, CW-1 took the suspected fentanyl from the front passenger's seat, and CW-1 left the $1,600 in OAF on the rear passenger's seat, which SIERRA-BAEZ then retrieved.  CW-1 and SIERRA-BAEZ then separated.  CW-1's account of the incident was confirmed after reviewing the audio and video recordings.  CW-1 was again searched for contraband with negative results.  This transaction was captured on audio and video recording.  Agents performed a field test on the suspected fentanyl supplied by SIERRA-BAEZ, which was presumptively positive for the presence of fentanyl. The approximate weight of the substance was 40.85 grams. Agents sent the suspected fentanyl to the DEA Northeast Laboratory for analysis and testing.  The results are pending.

## THE SUBJECT PREMISES AND SUBJECT VEHICLE 1
## CONTAIN EVIDENCE, FRUITS, AND INSTRUMENTALITIES

42.     I also have probable cause to believe that Subject Premises and Subject Vehicle 1 to be searched contain fruits, evidence, and instrumentalities of violations of the federal statutes listed above, as described in Attachment B.

### *The Subject Premises*

43.     As described above, in each of the controlled fentanyl transactions, SIERRA-BAEZ was observed departing from his residence at 161 Berkley Street and traveling directly to the place of exchange with CW-1.  As described in Attachment A-1, 161 Berkley Street is a multi-unit apartment building.

44.     According to my review of commercial databases, SIERRA-BAEZ appears to be associated with Apartment 13 at 161 Berkley Street, the Subject Premises.  On April 20, 2022, TFO O'Connor and I conducted further surveillance at 161 Berkley Street to verify that SIERRA-BAEZ resides in Apartment 13.  At approximately 9:16 a.m., I observed SIERRA-BAEZ arrive at 161 Berkley Street operating Subject Vehicle 1.  Operating in an undercover capacity as a delivery driver, I followed SIERRA-BAEZ into the building.   Once in the vestibule, I had a brief conversation with SIERRA-BAEZ and asked him which apartment he lived in; SIERRA-BAEZ pointed to the mailbox labeled "13."  SIERRA-BAEZ then entered the building through a second set of doors and went to the second floor where apartment 13 is located.

### *Subject Vehicle 1*

45.     As described above, Subject Vehicle 1 was used by SIERRA-BAEZ to conduct four drug transactions with CW-1.  Based on law enforcement surveillance, Subject Vehicle 1 is

routinely parked at the Subject Premises.  This Court previously authorized a tracking warrant for

Subject Vehicle 1, *see* No. 22-mj-2160-MBB.

### DRUG TRAFFICKERS' USE OF RESIDENCES, STASH LOCATIONS, VEHICLES, AND CELLULAR TELEPHONES

46.     Based upon my experience and the experience of other law enforcement officers

who have participated in the execution of numerous search warrants at the residences and in the

vehicles of drug-traffickers, it is generally a common practice for drug traffickers to maintain in

their residences and vehicles records relating to their drug trafficking activities.  Because drug

traffickers in many instances will "front" (that is, sell on consignment) controlled substances to

their clients, or alternatively, will be "fronted" controlled substances from their suppliers, record-

keeping is necessary to keep track of amounts paid and owed, and such records are often kept close

at hand so that current balances can be verified and recorded.  Often drug traffickers keep "pay

and owe" records to show balances due for drugs sold in the past ("pay") and for payments

expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug

traffickers often maintain telephone and address listings of clients and suppliers and keep them

immediately available in order to efficiently conduct their drug trafficking business.  I am also

aware that drug traffickers often maintain such documents related to their drug trafficking activities

at their residences for an extended period of time, regardless of whether they are physically in

possession of drugs on the premises.

47.     Even when drug dealers store their drugs outside their residence at stash locations,

I know that they often will keep records relating to these offsite storage locations at their residence.

Such documents include rental or storage property agreements and receipts.

48.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for traffickers to conceal at their residences either the proceeds from drug sales or monies to be used to purchase controlled substances.  Drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances and launder drug proceeds. Based on my training and experience, evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking are often kept in the residences of the drug traffickers and money launderers.  The cash proceeds of drug trafficking often contain traces of the narcotics sold or bought by the drug dealers.

49.     Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking and money laundering activities, and many of these cellular telephones are kept at their residences.  It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, stash locations, and businesses.  Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them.  Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones.  As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular target but had nevertheless been retained.

50.     When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement.

17

In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found inside the residence of the drug trafficker or money launderer.

51.     During the course of residential and storage location searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the offenses under investigation. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. Furthermore, I have learned from this and other investigations that records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons. Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility.

52.     Finally, as noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs. Such evidence can include internet searches, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages. From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones. As discussed above, the Target Subject has used

cellular telephones in furtherance of his drug trafficking and money laundering activities. As such, I believe evidence of the Target Offenses will be found on the cellular telephones used and/or possessed by the Target Subject and will be found at the Subject Premises.

53.     It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

54.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I know that electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files,

or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device

that is not allocated to an active file or that is unused after a file has been allocated to a set block

of storage space – for long periods of time before they are overwritten.  In addition, a computer's

operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly,

files that have been viewed via the Internet are automatically downloaded into a temporary Internet

directory or "cache."  The browser typically maintains a fixed amount of hard drive space devoted

to these files, and the files are only overwritten as they are replaced with more recently viewed

Internet pages.  Thus, the ability to retrieve residue of an electronic file from an electronic storage

device depends less on when the file was sent, downloaded, or viewed than on a particular user's

operating system, storage capacity, and habits.

55.     Based on all of the information I have obtained during the course of this

investigation, and for the reasons more specifically set forth herein, I believe that the Target

Subject is engaged in the Target Offenses and that evidence, fruits, and instrumentalities of the

Target Offenses will be found inside the Subject Premises and on cellular telephones seized

therefrom.

## CONCLUSION

56.     Based on the information described above, I have probable cause to believe that on

or about February 22, March 10, March 16, April 14, and May 5, 2022, , in the District of

Massachusetts, Rafael SIERRA-BAEZ did knowingly and intentionally distribute and possess

with intent to distribute a mixture and substance containing a detectable amount of N-phenyl-N-

[l-(2-phenylethyl)-4-piperidinyl] propanamide, also known as fentanyl, a Schedule II controlled

substance, in violation of 21 U.S.C. § 841(a)(1).

57.     Based on the information described above, I further submit that there is probable

cause to believe that evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1)

and 846, as described in Attachment B, are contained within the Subject Premises and Subject

Vehicle 1, described in Attachments A-1 and A-2, respectively.


I declare that the foregoing is true and correct.

_____
John Hannigan, Task Force Officer
Drug Enforcement Administration


Sworn to by telephone in accordance with Fed. R. Crim. P. 4.1 on this 18th day of May, 2022.

_____
HON. MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A-1**

**DESCRIPTION OF THE SUBJECT PREMISES TO BE SEARCHED**

The premises to be searched is located at 161 Berkeley Street, Apartment 13, Lawrence, Massachusetts. The building at 161 Berkeley Street Lawrence, Massachusetts, is a multi-unit apartment complex. The building is made of red brick and contains white trim. The building has the name "Clover Hill Apts" affixed to the front in white lettering. The numbers "161" are affixed to the building above the front entry door in black numbering. Apartment 13 is on the second floor.

*Front Entrance*



*Side View*



**ATTACHMENT A-2**

**DESCRIPTION OF SUBJECT VEHICLE 1 TO BE SEARCHED**

Subject Vehicle 1 to be searched is a 2008 red Mazda CX-9, bearing MA Registration 164S50 VIN #JM3TB38V280127425. This vehicle is registered to Rafael SIERRA-BAEZ.



## ATTACHMENT B

### ITEMS TO BE SEIZED

I.      All records, in whatever form, and tangible objects that constitute evidence, fruits,

or instrumentalities of violations of 18 U.S.C. §§ 841(a)(1) and 846, including:

1.  Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances and the laundering of drug proceeds, including records of sales, records of purchases, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, telephone bills, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and keys.

2.  Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys, and items commonly maintained in vehicles, such as registration, insurance, and identification documents.

3.  Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4.  Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

5.  Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

6.  Cellular telephones in the possession of or used by SIERRA-BAEZ, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking, located in the memory of any mobile telephone, including but not limited to:

a. Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

b. Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

c. Text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

d. Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking, or individuals engaged in drug trafficking;

e. GPS and other location data;

f. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking, or individuals engaged in drug trafficking;

g. Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking, or individuals engaged in drug trafficking;

h. All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i. Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

## RETURN OF SEIZED COMPUTER EQUIPMENT

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below. If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party

seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant for as long as is necessary for authentication purposes.